**STATE of North Dakota, Plaintiff and Appellee,**

v.

**Darius Tardell McKINNEY, Defendant and Appellant.**

**Cr. No. 930297.**

Supreme Court of North Dakota.

June 28, 1994.

Brett M. Shasky, Asst. State's Atty., Fargo, for plaintiff and appellee.

Leslie D. Johnson, Fargo, for defendant and appellant.

SANDSTROM, Justice.

Darius Tardell McKinney was convicted by a jury of conspiracy to deliver a controlled substance and possession of a controlled substance with intent to deliver. McKinney appeals contending insufficient evidence to support the convictions, the prosecutor's closing argument to the jury and a question to McKinney on cross-examination were so unfairly prejudicial as to deprive him of his right to a fair trial, and key state witnesses gave false testimony. Because McKinney has not established reversible error, we affirm.

I

We view the evidence in the light most favorable to the jury verdicts. *E.g., State v. Heintze*, 482 N.W.2d 590, 591 (N.D.1992). On November 13, 1992, Carlos Terrell Myles arrived in Fargo by bus from St. Paul, Minnesota. Myles testified he came to Fargo to attend a football game the following weekend and to bring between "an ounce and a half to two ounces of cocaine" for McKinney. Myles testified that approximately one month before, he talked to McKinney about bringing cocaine to Fargo. According to Myles, McKinney "had already sold an ounce and so he was askin' when the next time I was comin' back." Myles testified he saw McKinney "on the streets" when he arrived, got into his car, gave him the cocaine, and McKinney "dropped me off, then he was

supposed to bring me back like $1500.00, and that was our agreement."

On November 19, 1992, McKinney discussed with Bobbi Jo Yanez the possibility of her buying up to two ounces of cocaine. Yanez testified she was going to buy the cocaine for "2400.00" and McKinney told her it was "really good stuff" "somebody was bringing" from Minneapolis. Yanez, who had never "purchased that large of amount," testified she was supposed to pick up the cocaine at McKinney's residence the following day.

After making these arrangements with McKinney, Yanez, who had decided to assist the police, contacted Detective Jim LeDoux of the Fargo Police Department and told him McKinney "was getting in a lot of cocaine and that if he wanted I would go and buy it and he could bust him." The trial court sustained defense counsel's objection to Yanez's attempted explanation of why she decided to assist the police. The police told Yanez to meet with them the next morning.

On the evening of November 19, Myles borrowed McKinney's car. He purchased cologne, gambled at a bar, and spent the night at a friend's home. He returned to McKinney's apartment around noon on November 20, 1992.

On the morning of November 20, Yanez met with police who fitted her with a body transmitter and discussed the procedure to be followed that day. Yanez went to McKinney's apartment at about 12:30 p.m., discussed the purchase with McKinney, and told him she would get the money from "Marilyn." Yanez left the apartment and told the police she thought she had seen "a lot" of cocaine on a cookie sheet in McKinney's oven. She also told them there was marijuana in the apartment.

Yanez returned to the apartment a short while later. According to Yanez, during this visit, McKinney pulled the cocaine, contained in a plastic bag enclosed in a "sports sock," out of the pocket of a leather jacket. Yanez testified McKinney "tried to give me some cocaine to take to Marilyn for her to try," but she declined. Yanez also testified McKinney was getting ready to "cut" the cocaine on the kitchen table when she left the apartment. After leaving, she told the police what she had seen. Based on this information, the police obtained a no-knock search warrant which they executed at 2:40 p.m. that day.

McKinney and Myles were in the apartment during the search. The officers found a plastic bag containing between one and one-half to two ounces of cocaine, stuffed in a sock in the pocket of the leather jacket. According to one of the officers, "the texture of the leather [jacket] was somewhat unique ... it doesn't look like any other jacket." The police also found cologne and McKinney's car keys in the jacket. The police found no other controlled substances or drug paraphernalia in the apartment.

McKinney was charged with conspiracy to deliver a controlled substance and possession of a controlled substance with intent to deliver. At the time of McKinney's trial, Myles had not been charged with any criminal offense relating to this incident. In his defense, McKinney testified he had no knowledge Myles had brought cocaine from St. Paul, he did not know the leather jacket contained the cocaine, and the leather jacket did not belong to him. Myles and Yanez testified to the contrary. Myles testified the leather jacket was not his and he had never owned a leather jacket. Yanez and her sister-in-law both testified they had seen McKinney wear the jacket on previous occasions.

The jury returned guilty verdicts on both counts. This appeal, brought by an attorney who was not McKinney's trial counsel, followed.

## II

To successfully challenge the sufficiency of the evidence on appeal, a defendant must convince us the evidence, when viewed in the light most favorable to the verdict, permits no reasonable inference of guilt. *Heintze*, 482 N.W.2d at 592. As an appellate court, we do not resolve conflicts in the evidence, determine the credibility of witnesses and reconcile their testimony, or weigh the evidence. *State v. Nelson*, 488 N.W.2d 600, 602 (N.D.1992); *State v. Flynn*, 479 N.W.2d 477, 480 (N.D.1992). We merely "'review

the record to determine if there is competent evidence that allows the jury to draw an inference reasonably tending to prove guilt, and fairly warranting a conviction.'" *State v. VanNatta,* 506 N.W.2d 63, 71 (N.D.1993) [quoting *State v. Frey,* 441 N.W.2d 668, 672 (N.D.1989) ].

## A

Under N.D.C.C. § 12.1–06–04(1), "[a] person commits conspiracy if he agrees with one or more persons to engage in or cause conduct which, in fact, constitutes an offense or offenses, and any one or more of such persons does an overt act to effect an objective of the conspiracy. The agreement need not be explicit, but may be implicit in the fact of collaboration or existence of other circumstances." The statute embodies the unilateral conspiracy theory rather than the bilateral theory, and a person need only believe he was participating in an agreement with another to engage in criminal conduct, manifested by some overt act, to commit the offense. *State v. Rambousek,* 479 N.W.2d 832, 835 (N.D.1992). The defendant need not have committed the overt act charged, that one of the conspirators knowingly committed it is sufficient. *State v. Lind,* 322 N.W.2d 826, 844–845 (N.D.1982).

One of the overt acts charged in this case was that a conspirator, Myles, "travel[ed] from the state of Minnesota to transport the controlled substance" in order "to effect an objective of the conspiracy," the delivery of cocaine. Myles testified he traveled to Fargo from St. Paul to deliver cocaine for McKinney to sell. Myles further testified he gave McKinney the cocaine and McKinney was supposed to pay him $1,500 because "that was our agreement." There is sufficient evidence to support McKinney's conviction for conspiracy to deliver a controlled substance.

## B

Under N.D.C.C. § 19–03.1–23(1), "it is unlawful for any person to willfully, as defined in section 12.1–02–02 ... possess with intent to ... deliver, a controlled substance, ..." A "willful" possession of a controlled substance may be actual or constructive, exclusive or joint, and may be shown entirely by circumstantial evidence. *State v. Dymowski,* 458 N.W.2d 490, 500 (N.D.1990). *See also State v. Connery,* 441 N.W.2d 651, 655 (N.D.1989). Constructive possession may be established by showing the defendant had the power and ability "'to exercise dominion and control over'" the controlled substance. *Dymowski* [quoting *State v. Morris,* 331 N.W.2d 48, 54 (N.D.1983) ].

Although McKinney denied any knowledge of the cocaine in the jacket and denied ownership of the jacket itself, the testimony of Myles and Yanez implicated him in a planned sale of cocaine. Yanez testified she saw McKinney pull the cocaine stuffed in a sports sock out of the leather jacket shortly before the police searched McKinney's apartment and found the cocaine in the jacket. The amount of cocaine was the largest Yanez had ever attempted to purchase. *See State v. Rodriguez,* 454 N.W.2d 726, 731 (N.D. 1990) ["one ounce of cocaine is a quantity which is larger than that intended for personal use...."]. Myles testified the leather jacket was not his and he had never owned one. Yanez and her sister-in-law testified they had seen McKinney wear the jacket before. We conclude there is substantial evidence to support the jury verdict. *See State v. Rehling,* 426 N.W.2d 6, 8 (N.D.1988).

## III

McKinney asserts the prosecutor used "inflammatory remarks" during his closing argument and during his cross-examination of McKinney that unfairly prejudiced him and deprived him of his right to a fair trial.

## A

The control and scope of opening and closing arguments are largely left to the discretion of the trial court, and a verdict will not be reversed on the ground the prosecutor exceeded the scope of permissible closing argument unless the defendant establishes the prosecution's comments were improper and prejudicial. *State v. Marks,* 452 N.W.2d 298, 302 (N.D.1990). To be prejudicial, absent a fundamental error, improper closing argument by the prosecutor must have

stepped beyond the bounds of any fair and reasonable criticism of the evidence, or any fair and reasonable argument based upon any theory of the case having support in the evidence. *State v. Schimmel,* 409 N.W.2d 335, 342 (N.D.1987).

McKinney relies on the following "inflammatory remarks" and allegedly "inaccurate comments" made by the prosecutor during his closing argument: (1) McKinney "was responsible for having Carlos Myles bring almost two ounces of cocaine into Fargo back in November of 1992;" (2) McKinney's "plan as we heard from Carlos Myles began back in October of 1992;" (3) Yanez met with officers and told them "she had seen the cocaine inside a sock, inside a leather jacket that was in the Defendant's apartment;" (4) "You've just heard the defense argument and now it appears that [prosecution witnesses are] on trial.... Everybody is on trial according to the defense except the Defendant;" and (5) "Remember the type of case we're dealing with here. This is a drug case." Defense counsel did not object at trial to any of these comments by the prosecutor or ask for a cautionary instruction.

▮▮▮▮ This court has held, even when a defendant's objection to a prosecutor's improper argument is sustained by the trial court, the failure to request a cautionary instruction waives the objection to the allegedly prejudicial statement. *State v. Welch,* 426 N.W.2d 550, 553 (N.D.1988). Consequently, this issue was not properly preserved for review on appeal, and our inquiry is limited to determining whether the trial court committed obvious error affecting substantial rights of the defendant under N.D.R.Crim.P. 52(b). *State v. Thill,* 473 N.W.2d 451, 453 (N.D.1991). Our authority to notice obvious error is exercised cautiously and only in exceptional circumstances where the defendant has suffered serious injustice. *State v. Mertz,* 514 N.W.2d 662, 670 (N.D. 1994).

▮▮▮▮ No obvious error occurred here. The prosecutor's statements appear to be fair comments based on the evidence presented at trial. We see nothing "inflammatory" about them. Even assuming the comments may have constituted misstatements of

the evidence to a small degree, the trial court instructed the jury that "closing arguments of counsel ... are not evidence" and "[i]f counsel or I have made any comments or statements concerning the evidence which you find are not warranted by the evidence, you should wholly disregard them and rely upon your own recollection or observation." A jury is presumed to follow a trial court's admonition and instruction in this regard. *See State v. Paulson,* 477 N.W.2d 208, 210 (N.D.1991); *City of Grand Forks v. Cameron,* 435 N.W.2d 700, 704 (N.D.1989). McKinney has not established reversible error based on the prosecutor's closing argument.

### B

McKinney contends the prosecution improperly commented on his race. During trial, the prosecutor cross-examined McKinney as follows:

"Q  Now, Mr. McKinney, do you—you don't have any family in this area right now?

"A  No.

"Q  Just an ex-wife?

"A  Yes.

"Q  Okay.  And you have a child down in Texas?

"A  Yes.

"Q  You are not working?

"A  Yes.

"Q  At the present time?

"A  No, I'm not.

"Q  Not going to school?

"A  No.

"Q  And you are staying here in the frozen tundra of North Dakota?

"A  It's the United States.  Why not?

"Q  Just checking.  I mean, I don't want to—

"A  Well, I've been here since 1982.

"Q  You can stay here.  That's for sure.

"A  I've been here since 1982."

Defense counsel did not object to the prosecutor's "frozen tundra" question, and the prosecutor went on to pursue other matters. McKinney asserts "these remarks stirred

within the jury stereotypes of African–American culture which have roots of ignorance and misunderstanding, and may have done more to convict [McKinney] than all the conflicting and circumstantial evidence presented." Once again, because no objection was made at trial to the prosecutor's question, we review for obvious error affecting substantial rights of the defendant under N.D.R.Crim.P. 52(b). *Thill.*

A prosecutor's statements calculated to inflame the racial, religious, or ethnic prejudices of jurors introduce into the trial elements of irrelevance and irrationality that cannot be tolerated in a society based upon the equality of all citizens before the law. *See State v. Mehralian,* 301 N.W.2d 409, 417–419 (N.D.1981); Annot., *Prosecutor's Appeal in Criminal Case to Racial, National, or Religious Prejudice as Ground for Mistrial, New Trial, Reversal, or Vacation of Sentence—Modern Cases,* 70 A.L.R.4th 664, 670 (1989); ABA, *Standards Relating to the Prosecution Function and the Defense Function* § 5.8 Commentary c (Approved Draft 1971). As one court has stated, "remarks containing racial overtones and made in an apparent attempt to arouse racial fear and animosity and to malign a defendant who is black amount to a clear attempt to undermine the judicial process." *People v. McKay,* 138 Ill.App.3d 446, 93 Ill.Dec. 47, 51, 485 N.E.2d 1257, 1261 (1985). When a prosecutor uses racial remarks in an effort to persuade a jury to return a guilty verdict, the defendant's due process right to a fair trial is violated. *See, e.g., McFarland v. Smith,* 611 F.2d 414 (2d Cir.1979). Although the prosecutor's question in this case carried the potential for racial overtones, we do not believe McKinney has established obvious error requiring reversal of his conviction.

The prosecutor's question was poorly conceived and improper; why McKinney, or anyone else, would choose to live in the "frozen tundra of North Dakota" was of no relevance. McKinney emphasizes the racial significance of the prosecutor's question. We

conclude the question was vague and did not contain any direct racial slurs. *See People v. Montague,* 149 Ill.App.3d 332, 102 Ill.Dec. 699, 707, 500 N.E.2d 592, 600 (1986). The question could have been posed to a person of any race who had relatively few longstanding ties to North Dakota, and easily could have been motivated by certain perceptions of North Dakota's climate, rather than by any appeal to racial prejudice.

Moreover, the prosecutor's question came during the midst of a three-day trial, and the prosecutor did not dwell on the question. Upon our review of the entire record, we find nothing reflecting an ongoing attempt on the part of the prosecutor to inflame the jurors with racial prejudice. Nor can we say the question had a decisive effect on the jury's verdict. The prosecutor's question was not so obviously prejudicial and inflammatory as to require the trial court to act on its own to preserve McKinney's right to a fair trial. *Compare McKay* (in a case of an African–American charged with burglary, prosecutor's argument that defendant, who lived on south side of Chicago, did not belong in suburb of Elmhurst was not an appeal to jury's racial bias by implying African–American people do not belong in Elmhurst and if they are found there, they must be committing crime); *People v. Johnson,* 220 Ill. App.3d 550, 163 Ill.Dec. 167, 175–176, 581 N.E.2d 118, 126–127 (1991) (in a case of an African–American charged with robbery, prosecutor's argument that there was no reason for defendant, who lived on south side of Chicago, to be in city's North Lincoln Park "except to cause trouble, to look for some victim," was not an appeal to jury's racial bias). *See also* Annot., 70 A.L.R.4th, at §§ 17 and 18, and cases collected therein.[1]

This isolated incident does not require reversal where there is no indication the question was intended to, nor in fact did, appeal to any prejudice of the jury. *See People v. Traylor,* 139 Ill.App.3d 443, 94 Ill.Dec. 163, 165, 487 N.E.2d 1040, 1042 (1985). We con-

1. In M. Ahlen, *The Need for Closing Argument Guidelines in Jury Trials,* 70 N.D.L.Rev. 95, 108 (1994), the author advocates the development of guidelines clearly outlining the permissible types of closing argument and prohibited practices to

"reduce the chance of innocent error which might cause a mistrial or reversal at the client's expense" and to "provide a fairer trial by removing some of the distractions which could improperly influence jurors."

clude McKinney has not established obvious error.

### IV

█ McKinney asserts the convictions should be reversed and he should be granted a new trial because Yanez and Myles gave false testimony during the trial. This issue is not properly before us for review.

█ During trial, Yanez acknowledged she was not being compensated by the State for her testimony, she was not testifying to try "to get off from another offense," and she was not "involved in any court proceedings during the fall of 1992." Myles acknowledged he had not been given promises or granted immunity in exchange for his testimony and stated he had merely been subpoenaed to testify. McKinney asserts Yanez and Myles "benefited from their testimony in this case by the leniency with which the courts later dealt with them on their own charges." To support his argument, McKinney relies on documents obtained after his trial which are included as part of the appendix on appeal. However, these documents were not presented to the trial court, are not a part of the certified record on appeal, and therefore, we cannot consider them. *See, e.g., State v. Purdy,* 491 N.W.2d 402, 407 (N.D.1992).

What McKinney essentially seeks is a new trial based on newly discovered evidence. However, the proper procedure requires this request be directed to the trial court in the first instance through a timely motion for new trial under N.D.R.Crim.P. 33, which was not done here. *See State v. Morstad,* 493 N.W.2d 645, 646 (N.D.1992); *United States v. Huff,* 959 F.2d 731, 738 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 162, 121 L.Ed.2d 110 (1992); *United States v. Boberg,* 565 F.2d 1059, 1062 (8th Cir.1977); *Williams v. State,* 254 Ga. 6, 326 S.E.2d 444, 447 (1985). An application for post-conviction relief may also be based on the ground "[e]vidence, not previously presented and heard, exists requiring vacation of the conviction or sentence in the interest of justice." N.D.C.C. § 29–32.1–01(1)(e). *See also Sampson v. State,* 506 N.W.2d 722, 728–729 (N.D.1993) (addressing contention in post-conviction proceeding that prosecutor knowingly used perjured testimony based on "deal" with witness who, after defendant's trial, received a reduced sentence for felony theft charges); *State v. Schlickenmayer,* 364 N.W.2d 108, 111 (N.D.1985) (sufficiency of showing necessary to obtain new trial based on newly discovered evidence is the same whether ground is raised in motion for new trial or in application for post-conviction relief). Either procedure allows the trial court to hear the evidence and make the factual findings necessary when the knowing use of false testimony is alleged (*see State v. Thiel,* 515 N.W.2d 186 (N.D.1994)), thereby facilitating a meaningful review in the event of an appeal.

We cannot address the merits of McKinney's argument for the first time on appeal. *See Morstad.*

The convictions are affirmed.

VANDE WALLE, C.J., and NEUMANN and MESCHKE, JJ., concur.

LEVINE, J., concurs in the result.