**James Leroy BIEBER, Petitioner and Appellee,**

v.

**NORTH DAKOTA DEPARTMENT OF TRANSPORTATION DIRECTOR, Respondent and Appellant.**

Civ. No. 930180.

Supreme Court of North Dakota.

Dec. 2, 1993.

Douglas B. Anderson, Asst. Atty. Gen., Atty. General's Office, Bismarck, for respondent and appellant.

Robin L. Olson of Nelson Law Office, Fargo, for petitioner and appellee.

SANDSTROM, Justice.

The Director of the Department of Transportation suspended James Leroy Bieber's driving privileges for 91 days for driving a vehicle while under the influence of alcohol. The district court reversed, holding the Director's decision was based on improperly introduced evidence. The district court concluded the vacutainer tube used to collect Bieber's blood was a "device" under N.D.C.C. § 39–20–07(5), and therefore, must be certified by the State Toxicologist.

We reverse, holding: (1) Bieber failed to establish his blood-test results were unreliable absent certification of vacutainers by the State Toxicologist, and (2) Bieber was not prejudiced by the administrative hearing officer's failure to correctly rule on his evidentiary objections.

I

On January 9, 1993, Bieber was stopped for speeding by Trooper Bradley Smith of the North Dakota State Highway Patrol. While giving Bieber a speeding citation, Trooper Smith noticed Bieber's eyes were bloodshot and watery, his face was flushed, and his speech was slurred. Following the administration of sobriety tests, Bieber was arrested for driving under the influence.

Bieber was transported to the Jamestown Hospital emergency room where he agreed to submit to a blood test. A nurse gave Trooper Smith a sealed, intact blood-collection kit. The kits are stored at the hospital. Trooper Smith opened the kit and the nurse removed the items needed for blood collection. A sample of Bieber's blood was drawn by a registered nurse. The sample was subsequently analyzed by the State Toxicologist and revealed Bieber had a blood-alcohol concentration of .17 percent.

Bieber was notified of the Director's intent to suspend his driver's license and timely requested an administrative hearing. At the administrative hearing, Bieber objected to the introduction of Exhibit 11, a certified copy of his blood-test results. Bieber argued Exhibit 11 should be disallowed because there was no showing a proper device was used in the drawing of his blood, or that he had nothing to eat, drink, or smoke for twenty minutes prior to the administration of the test. The hearing officer noted the objection and admitted Exhibit 11 into the record.

At the close of the hearing, the hearing officer concluded Trooper Smith had reasonable grounds to believe Bieber had been driving a vehicle while under the influence of alcohol, Bieber was tested in accordance with the law, and Bieber had a blood-alcohol concentration of at least ten one-hundredths of one percent by weight. The hearing officer suspended Bieber's driving privileges for 91 days.

Bieber appealed the administrative hearing officer's decision to the district court. The district court reversed, finding the results of Bieber's blood test were improperly received into evidence. The court concluded the vacutainer used to collect Bieber's blood and the gas chromatograph used to analyze Bieber's blood needed to be certified by the State Toxicologist. The Director appeals.

II

We recently summarized the appropriate standard of review for a challenge to an administrative decision:

"An appeal from an administrative hearing officer's decision involving a license suspension under N.D.C.C. § 39–20–04.1 is governed by the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32. *Hammeren v. North Dakota State Highway Com'r*, 315 N.W.2d 679, 683 (N.D.1982). This Court examines the record of the

administrative agency rather than the findings of the district court. *Holler v. Dept. of Transp. Director,* 470 N.W.2d 616, 617 (N.D.1991). Since this appeal involves the interpretation of a statute, a legal question, this Court will affirm the agency's order unless it finds the agency's order is not in accordance with the law. *See* N.D.C.C. §§ 28–32–21 and 28–32–19."

*Erickson v. Director, N.D. Dept. of Transportation,* 507 N.W.2d 537, 539 (N.D.1993).

### III

Bieber argues his blood test was not "fairly administered" and should not have been admitted into evidence because the vacutainer used to collect and store his blood sample had not been individually inspected and certified by the State Toxicologist. The foundational requirements for admission of chemical blood-test results are found in N.D.C.C. § 39–20–07(5):

"5. The results of the chemical analysis must be received in evidence when it is shown that the sample was properly obtained and *the test was fairly administered, and if the test is shown to have been performed according to methods and with devices approved by the state toxicologist,* and by an individual possessing a certificate of qualification to administer the test issued by the state toxicologist. *The state toxicologist is authorized to approve satisfactory devices* and methods of chemical analysis and determine the qualifications of individuals to conduct such analysis, and shall issue a certificate to all qualified operators who exhibit the certificate upon demand of the person requested to take the chemical test." (Emphasis added).

■ As we recently held in *Erickson,* 507 N.W.2d at 540, N.D.C.C. § 39–20–07(5) does not require the State Toxicologist to certify the devices used in his office to conduct chemical analysis of blood samples are in good working order. Section 39–20–07(5) requires devices used to analyze blood be approved by the State Toxicologist. Breath-testing devices, however, are required to be inspected and certified by the State Toxicolo-gist. *See* N.D.C.C. § 39–20–07(6); *State v. VandeHoven,* 388 N.W.2d 857, 859 (N.D. 1986).

In *Schense v. Hjelle,* 386 N.W.2d 888 (N.D. 1986), we reviewed the legislative history of § 39–20–07(5) and concluded:

"[T]he Legislature, by its use of the term 'devices' in the statute, did not intend to expand the certification and approval requirements ... to include auxiliary equipment that might be used in conjunction with a specific testing device.... We conclude that the term 'devices' as used in the statute refers to the testing equipment used to perform the chemical analysis of the subject sample, and not to auxiliary equipment or devices used during the testing procedure."

*Schense* at 890.

■ The vacutainer is a sealed tube used to store and preserve a blood sample until it can be analyzed by the State Toxicologist. The vacutainer is not used to perform chemical analysis and, therefore, is not a "device" under N.D.C.C. § 39–20–07(5). The vacutainer is an auxiliary device. Auxiliary devices need not be approved or certified by the State Toxicologist based on the requirement in N.D.C.C. § 39–20–07(5) that the State Toxicologist approve the methods and devices used in blood testing. Approval and certification, however, may be required under the N.D.C.C. § 39–20–07(5) requirement that such tests be "fairly administered." In *Schense,* we explained:

"Upon a proper record, we might be persuaded that an auxiliary device used in the testing sequence is of such a nature that, absent specific approval and certification of the device by the State Toxicologist, the test results would be so fraught with the possibility of error that the test could not be considered to be 'fairly administered' within the meaning of the statute."

*Schense* at 891.

■ The issue then, based on our holding in *Schense,* is whether Bieber has demonstrated his blood test was not "fairly administered" because the vacutainer used to collect and store his blood was not individually certified and approved by the State Toxicologist.

■ The official acts of the State Toxicologist are entitled to a disputable presumption of regularity. *See Erickson,* 507 N.W.2d at 539. The State Toxicologist, as part of the State's new blood-collection kits, approved the use of the vacutainer to minimize health risks associated with blood collection. Further, the record shows the blood-collection kits are assembled by the State Toxicologist and are sent as complete units to hospitals. When the kits are used, either the specimen collector or the specimen submitter is required to certify the blood-collection kit was intact before use. Because the State Toxicologist has chosen the vacutainer as a component of North Dakota's blood-collection kits and has assembled the kits in his office, the burden is on Bieber to demonstrate the vacutainer used to collect his blood was unreliable.

Bieber argues the test was not "fairly administered" because no foundation evidence was presented as to the chemicals contained in the vacutainer. At the administrative hearing, Trooper Smith testified he did not know what chemicals, if any, were contained in the vacutainer. The State Toxicologist's memorandum to emergency room personnel does not state the contents of the vacutainer.

■ Bieber argues the State Toxicologist must certify each vacutainer contains the appropriate chemicals. According to Bieber, absent individual certification or at the very least, approval through the testing of a random sample of vacutainers, the blood-test results are prima facie unreliable.

We are not persuaded the State Toxicologist's failure to state the chemicals in the vacutainer, or Trooper Smith's lack of knowledge of the vacutainer's contents sufficiently call into question the test's reliability. We find persuasive the Minnesota Supreme Court's reasoning in *State v. Dille,* 258 N.W.2d 565 (Minn.1977). In *Dille,* the Court ruled the absence of testimony regarding components of a blood-collection kit does not preclude admission of blood-test results:

> "Although it would have been desirable if the prosecution had identified the [unidentified white substance in the bottle used to collect blood] and had disclosed its effect on the accuracy of the test, the fact that the bottle and its contents were fur-

nished as a blood-testing kit by the Bureau of Criminal Apprehension provided a sufficient indicium of reliability to establish the prima facie admissibility of the test results. It was then incumbent upon defendant to suggest a reason why the blood test was untrustworthy."

*Dille* at 568 (footnote omitted).

We are also not persuaded, absent individual approval of each vacutainer or the testing of the contents of a random sampling of vacutainers, the test results are "so fraught with the possibility of error that the test could not be considered to be 'fairly administered' within the meaning of the statute." *Schense,* 386 N.W.2d at 891. Bieber failed to introduce evidence that the vacutainer used to collect his blood was defective, or the chemical components were defective or contaminated. Further, Bieber presented no evidence that the blood-test results could be adversely affected by a defect in the vacutainer, or such a defect would go unnoticed when the State Toxicologist conducted his analysis of the blood sample. Bieber has failed to overcome the disputable presumption of regularity.

### IV

■ Bieber contends the results of his blood test should not have been admitted into evidence because the gas chromatograph used to analyze his blood was not certified by the State Toxicologist. Bieber did not raise this objection at the administrative hearing. Failure to raise an issue at the administrative hearing normally precludes review by this Court. *See Nelson v. Cass County Social Services,* 424 N.W.2d 371, 375 n. 5 (N.D. 1988). Further, subsequent to briefing and submission of this case, we held the State Toxicologist is not required to certify the working condition of the gas chromatographs used in his office. *See Erickson,* 507 N.W.2d at 540.

### V

■ Bieber contends the administrative hearing officer incorrectly applied the rules of evidence to his hearing. Bieber made several evidentiary objections at the administrative hearing. The hearing officer noted Bieber's objections for the record and placed the disputed evidence into the record. Bie-

ber claims the hearing officer cannot merely note an objection for the record, but must rule on it by either sustaining or overruling the objection. He contends the hearing officer's failure to rule on his objections is the same as a blanket waiver of the rules of evidence.

In *Madison v. North Dakota Dept. of Transp.*, 503 N.W.2d 243 (N.D.1993), we held the Department of Transportation could not waive the use of the rules of evidence in administrative proceedings unless the Department explained why a deviation was necessary to ascertain the substantial rights of a party to the proceeding. *Madison* at 246. Our opinion in *Madison* was based on N.D.C.C. § 28–32–06(1), which provides:

"The admissibility of evidence in any proceeding before an administrative agency shall be determined in accordance with the North Dakota Rules of Evidence. An administrative agency, or any person conducting proceedings for it, may waive application of the North Dakota Rules of Evidence if a waiver is necessary to ascertain the substantial rights of a party to the proceeding, but only relevant evidence shall be admitted. The waiver must be specifically stated, orally or in writing, either prior to or at a hearing or other proceeding. All objections offered to evidence shall be noted in the record of the proceeding. No information or evidence except that which has been offered, admitted, and made a part of the official record of the proceeding shall be considered by the administrative agency, except as otherwise provided in this chapter."

In *Madison*, we reversed the Department's revocation of Madison's driving privileges because of the Department's "systemic disregard of law." *Madison* at 246. Bieber urges a similar result in this case.

The Director correctly notes, under N.D.C.C. § 28–32–06(1), a hearing officer is required to note all objections for the record. The Director contends the hearing officer ruled on Bieber's objections when he admitted the evidence into the record. According to the Director, the hearing officer overruled Bieber's objections.

Although the practical effect of the hearing officer's inclusion of the disputed evidence amounted to overruling Bieber's objections, the better practice is for the hearing officer to explicitly rule on each evidentiary objection. A ruling on each evidentiary objection will eliminate any misunderstanding as to whether the rules of evidence are being followed in the proceeding, or whether the hearing officer has waived the rules of evidence. Under N.D.C.C. § 28–32–06(1), any waiver of the rules must be carefully considered and explained. We trust, hereafter, hearing officers, to avoid a *Madison* result, will either specifically sustain or overrule evidentiary objections, or explain why the rules are being waived.

Unlike in *Madison*, Bieber did not object to the hearing officer's failure to correctly apply the rules of evidence. Additionally, the hearing officer's decision is supported by evidence properly introduced into the record. We conclude, Bieber was not prejudiced by the hearing officer's failure to rule on his objections.

The district court's decision is reversed, and the department's decision suspending Bieber's driver's license for 91 days is reinstated.

VANDE WALLE, C.J., and MESCHKE, NEUMANN and LEVINE, JJ., concur.